SIDLEY AUSTIN LLP
Thomas R. Califano (24122825)
Rakhee V. Patel (00797213)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:    (214) 981-3300
Facsimile:    (214) 981-3400
Email:         tom.califano@sidley.com
              rpatel@sidley.com

SIDLEY AUSTIN LLP
William E. Curtin (admitted *pro hac vice*)
Jon W. Muenz (admitted *pro hac vice*)
Patrick Venter (admitted *pro hac vice*)
Anne G. Wallice (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:    (212) 839-5300
Facsimile:    (212) 839-5599
Email:         wcurtin@sidley.com
              jmuenz@sidley.com
              pventer@sidley.com
              anne.wallice@sidley.com

*Attorneys for the Defendant Debtors*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| In re: | Chapter 11 |
| PROSPECT MEDICAL HOLDINGS, INC., *et al.*,[1] | Case No. 25-80002 (SGJ) |
| Debtors. | (Jointly Administered)<br>Rel. to Docket No. 1 |
| AMANDA CANNAVO, on behalf of herself and all others similarly situated,<br><br>   Plaintiff,<br><br>v.<br><br>PROSPECT MEDICAL HOLDINGS, INC., *et al.*,<br>   Defendants. | Adv. Pro. No. 25-08001-sgj |

### **Defendants' Brief in Support of the Motion to Dismiss**

---

[1]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/Prospect. The Debtors' mailing address is 3824 Hughes Ave., Culver City, CA 90232.

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Cinel v. Connick*,
    15 F.3d 1338 (5th Cir. 1994) ...............................................................................14

*Cooper v. Canidae Corp.*,
    No. 6:20-CV-077-H, 2020 WL 13532970 (N.D. Tex. Dec. 17, 2020).................................2, 3

*Crutchfield v. Match Grp., Inc.*,
    529 F. Supp. 3d 570 (N.D. Tex. 2021) ...............................................................13

*Dorsey v. Portfolio Equities, Inc.*,
    540 F.3d 333 (5th Cir. 2008) ...............................................................................14

*In re Flexible Flyer Liquidating Tr.*,
    511 F. App'x 369 (5th Cir. 2013) .......................................................14, 15, 16, 18

*Funk v. Stryker Corp.*,
    631 F.3d 777 (5th Cir. 2011) ...............................................................................14

*Halkias v. Gen. Dynamics Corp.*,
    137 F.3d 333 (5th Cir. 1998) ...............................................................................15

*Sullivan v. Leor Energy, LLC*,
    600 F.3d 542 (5th Cir. 2010) ...............................................................................14

*Varela v. AE Liquidation, Inc. (In re AE Liquidation, Inc.)*,
    866 F.3d 515 (3d Cir. 2017)...........................................................................15, 18

**Statutes**

*29 U.S.C. § 2101, et seq.*...............................................................................12, 13

**Other Authorities**

20 CFR § 639.9 .........................................................................................................14

Fed. R. Evid 201(b)...................................................................................................2

Fed. R. Evid. 201(c)(1) .............................................................................................2

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND .......................................................................................................... 2

    A.   The Chapter 11 Cases ....................................................................................... 3

    B.   The Pennsylvania Hospitals .............................................................................. 3

    C.   The Closure Motion and Efforts to Avoid Closure ........................................... 5

    D.   The Defendant Debtors Obtain Short-Term Funding To Postpone Closure ...... 6

    E.   Continued Optimism and Additional Funding ................................................... 7

    F.   The Defendant Debtors Continue To Seek A Long-Term Solution ................... 9

    G.   The WARN Notices and Supplemental Closure Motion ................................. 11

    H.   The Instant Lawsuit ......................................................................................... 12

ARGUMENT .............................................................................................................. 13

I.    Legal Standard ..................................................................................................... 13

II.   The Unforeseeable Business Circumstances Exception to WARN Mandates Dismissal ..... 14

CONCLUSION ........................................................................................................... 19

## INTRODUCTION

1.      On April 21, 2025, Prospect Medical Holdings, Inc., Prospect CCMC, LLC and Prospect Crozer, LLC (the "Defendant Debtors") were forced to take an action they had taken every conceivable step to avoid: they issued WARN notices to employees of their Pennsylvania Hospitals in connection with the closure of those facilities.  The Defendant Debtors waited until that date to issue the WARN notices not because they were delinquent or because they chose to ignore their regulatory obligations.  To the contrary, as the Court is aware, the Defendant Debtors were keenly aware of their WARN Act obligations and were in daily communication with all interested parties including the Commonwealth of Pennsylvania.  The Defendant Debtors delayed issuing notices because they were actively and desperately trying to obtain political support and financing to save the Pennsylvania Hospitals and the jobs and critical services they provided. Critically for purposes of this Motion, the Defendant Debtors, as well as all interested parties, reasonably believed until shortly before the WARN notices were issued that the Pennsylvania Hospitals would in fact remain open.

2.      Unfortunately, as often occurs with the issuance of a WARN notice, the Defendant Debtors now face a putative class action alleging that the WARN notices were deficient because they were not issued earlier.  While in some cases this category of WARN Act claim may have merit, this is not one of those cases.  WARN Act claims are subject to what is known as the "unforeseeable business circumstances" exception, which allows employers to provide shortened WARN notice where a closing or mass layoff is caused by business circumstances that were not reasonably foreseeable at the time that 60-day notice would have been required.  That exception clearly applies here.

3.      The judicially-noticeable record in this case establishes unequivocally that the Defendant Debtors were operating with the reasonable expectation that they would be successful

in fashioning a solution that would avoid the closure of the Pennsylvania Hospitals.  In fact, the Defendant Debtors were able to negotiate with their secured lenders to allow for the transfer of the Pennsylvania Hospitals to an acquirer free and clear of all secured debt.  The fact that those efforts ultimately were unsuccessful in saving the Pennsylvania Hospitals from closure, while tragic for many and devastating to the Defendant Debtors, does not invalidate the Defendant Debtors' defense.  To the contrary, that result is precisely the unforeseeable business circumstance that precludes WARN Act liability.

4.      This lawsuit is already a drain on limited estate resources.  It would only further waste the estate's resources to require full litigation of a matter that is so easily resolved at the pleadings stage.  The Complaint should be dismissed, promptly and with prejudice.

## **BACKGROUND**

5.      All facts herein are sourced from the Complaint, transcripts from public hearings in these chapter 11 cases, and/or public news reports.  "A court may take judicial notice of facts that are 'generally known within the trial court's territorial jurisdiction' or that 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'"  *Cooper v. Canidae Corp.*, No. 6:20-CV-077-H, 2020 WL 13532970 (N.D. Tex. Dec. 17, 2020) (citation omitted); Fed. R. Evid 201(b).  A court may take judicial notice on its own.  Fed. R. Evid. 201(c)(1).  "If a party requests a court take judicial notice of a fact and supplies the necessary information, the court must do so.  Specifically, a court 'may take judicial notice of prior court proceedings as matter of public record.'"  *Cooper*, 2020 WL 13532970, at *3 (quoting *In re Deepwater Horizon*, 934 F.3d 434, 440 (5th Cir. 2019)).  "These documents may be considered

part of the pleadings for purposes of a motion to dismiss." *Id.* (citing *In re Katrina Canal Breaches Lit.*, 495 F.3d 191, 205 (5th Cir. 2007)).

### A. The Chapter 11 Cases

6.      Beginning on January 11, 2025 (the "Petition Date"), each of the Defendant Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Court. The Defendant Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   No party has requested the appointment of a trustee or examiner in these cases.  On January 29, 2025, the Office of the United States Trustee appointed the Official Unsecured Creditors' Committee (the "Committee").

7.      A detailed description of the Defendant Debtors, their businesses, and the chapter 11 cases, are set forth in greater detail in the *Declaration of Paul Rundell in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 41] (the "First Day Declaration") (attached hereto as Ex. K at 579).[1]

### B. The Pennsylvania Hospitals

8.      In July 2016, certain of the Defendant Debtors acquired Crozer Health, which consisted of four general acute care hospitals, several outpatient facilities, and a comprehensive physician network of primary care and specialty practices (collectively, the "Pennsylvania Hospitals").  Persistent operating losses, which pre-dated and continued after the acquisition, led the Debtors to initiate a marketing process to divest the Pennsylvania Hospitals in 2022.  *See* First Day Declaration, ¶¶ 11, 20, 73 (attached hereto as Ex. K at 581, 584, 605).

---

[1]   Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the First Day Declaration.

9.      As early as the January 14, 2025 First Day Hearing, the Defendant Debtors disclosed that the Pennsylvania Hospitals faced severe challenges but that the Defendant Debtors were committed to keep them operating and quickly transition them to new operators:

> We have been in discussions with the Commonwealth of Pennsylvania. . . . trying to work out a transition of those facilities to operators chosen by the Commonwealth of Pennsylvania . . . And **we have pledged to do whatever we can with them to get these -- keep these hospitals operating** and get them in the right -- in the right hands. And hands that are chosen. If we're not going to do the sale process, we're basically going to ask Your Honor to approve transitioning the operations to the designee of the Attorney General.

First Day Hearing Tr., Dkt. 164 at 18 (emphasis added) (attached hereto as Ex. B at 38).

10.      On February 3, 2025, the Defendant Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Approving and Authorizing (A) the Asset Purchase Agreement and the Private Sale of the Pennsylvania Hospitals Free and Clear of Interests, (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (C) the Settlement by and among the Debtors, the Pennsylvania Attorney General, Samuel Lee, and David Topper, Pursuant to Bankruptcy Rule 9019; and (II) Granting Related Relief* [Docket No. 332] (the "Crozer Sale Motion") (attached hereto as Ex. M at 662-693), seeking approval to, among other things, transfer the Pennsylvania Hospitals to an entity supported by the Commonwealth of Pennsylvania (the "Commonwealth").  Unfortunately, shortly after filing the Crozer Sale Motion, the Debtors learned that the entity they had negotiated with to take over the Pennsylvania Hospitals would be unable to complete a transaction in the required time frame.  *See Supplemental Declaration of Paul Rundell in Support of Debtors' Emergency Motion for Entry of an Order (I) Approving the Closure of the Pennsylvania Hospitals; and (II) Granting Related Relief* [Docket No. 1575] (the "Supplemental Rundell Declaration"), ¶ 6 (attached hereto as Ex. L at 645).

11.    Following this news, the Defendant Debtors continued to work closely with the Pennsylvania Attorney General (the "Pennsylvania AG"), to attempt to find a willing future operator of the Pennsylvania Hospitals. *See id.* at ¶¶ 8-12 (attached hereto as Ex. L at 546-48).

12.    Despite extensive efforts, the Defendant Debtors and the Pennsylvania AG were not able to secure a new operator for the Pennsylvania Hospitals.  Given the mounting losses at the hospitals, the lack of continued available funding, and the absence of a replacement operator or actionable funded alternative, the Defendant Debtors made the difficult decision to seek approval of a safe and expeditious closing process for the Pennsylvania Hospitals. *See id.* at ¶ 30 (attached hereto as Ex. L at 654-55).

### C.   The Closure Motion and Efforts to Avoid Closure

13.    On March 6, 2025, the Defendant Debtors filed their *Emergency Motion for Entry of an Order (I) Approving the Closure of the Pennsylvania Hospitals; and (II) Granting Related Relief* [Docket No. 882] (the "Closure Motion") (attached hereto as Ex. N at 694-729), which sought, among other things, approval of procedures to provide for a streamlined process for Court approval of the Pennsylvania Hospital facility closures, including rejecting executory contracts and abandoning certain assets in connection therewith (such procedures, the "Closure Plan").

14.    That same day, the Court held a hearing, during which the Defendant Debtors reported that:

> As Your Honor knows, we think it's our duty to exhaust every possible option with regard to the Debtors' Pennsylvania hospitals . . . **the Debtors' unequivocal goal since we filed this case was to avoid the closure of the Pennsylvania hospitals** . . . we've worked extremely closely with the Pennsylvania AG and other parties tirelessly . . . to identify the potential sources of funding that we would need in order to keep the hospitals open long enough to get to a long-term solution. . . So, up until this morning, and continuing right up **until about 25 minutes before the hearing started, we were hopeful that there was a positive solution that could be reached here, and we were avoiding as long as we could having to file a motion, a closure motion** . . . we thought that we had a short-term solution for funding, again, to buy us a little more time in the receivership to get to a long-term

> solution. . . Unfortunately, we learned, again, 25 minutes before the hearing started,
> that the discussions broke down and that there is no short-term solution . . .

March 6, 2025 Tr., Dkt. 916 at 3-4 (emphasis added) (attached hereto as Ex. C at 180-81).

15.     The Defendant Debtors' reporting was verified by counsel for the Committee, who

reported:

> We do know that from what we've seen and have been able to observe, the Debtors'
> facility team have been working around the clock to try and pull many rabbits out
> of a hat to try and keep the facilities open. So **we laud the Debtors for their efforts
> to try and keep the hospitals open.**

Id. at 46-47 (emphasis added) (attached hereto as Ex. C at 223-24).

16.     The Court, for its part, expressed hope and support that a funding solution would

be obtained and ordered that various parties meet in person in Harrisburg, Pennsylvania to

negotiate and discuss long-term funding of the Pennsylvania Hospitals.  *Id.* at 12, 36 (attached

hereto as Ex. C at 189, 213) (THE COURT:  **"I will never lose my optimism until I'm forced to**

. . . I'm going to say right now that I am ordering a face-to-face meeting.") (emphasis added).

### D.  The Defendant Debtors Obtain Short-Term Funding To Postpone Closure

17.     The Court-ordered negotiations were successful in achieving a short-term funding

commitment that allowed the Pennsylvania Hospitals to avoid closure while pursuing a long-term

solution.   On March 9, 2025, it was publicly announced by the Pennsylvania AG and the

Foundation for Delaware County ("Foundation") that there was "an agreement that will keep

Crozer Health open for the immediate future while permanent restructuring of the system is

solidified."  *See* John George, *Crozer Health Will Remain Open Following Emergency Meeting*,

PHILA. BUS. J. (Mar 9, 2025 11:19 ET), https://www.bizjournals.com/philadelphia/news/

2025/03/09/crozer-health-foundation-delaware-county-prospect.html (attached hereto as Ex. A-1

at 5-10).  The Attorney General stated that his "office will remain engaged in this process as the

partes work to find a long-term solution that will keep Crozer Health operational." *Id.* (attached hereto as Ex. A-1 at 8).

18.     On March 11, 2025, the Court held another hearing.  The Defendant Debtors reported that they would not be going forward on the Closure Motion and that the agreement reached in Harrisburg, by which the Foundation agreed to provide $7 million in funding, "gives us approximately two weeks to continue to work towards and attempt to finalize a long-term solution."  March 11, 2025 Tr., Dkt. 1162 at 5-6 (attached hereto as Ex. I at 552-53).

19.     The Court continued to encourage the Defendant Debtors in their efforts to the Pennsylvania Hospitals open.  *Id*. at 7, 18 (attached hereto as Ex. I at 554, 565) (THE COURT: "I breathed a sigh of relief when I heard from my courtroom deputy yesterday that we were not going forward on the closure motion.  Maybe I'll breathe a deeper sigh of relief next week if I hear things are progressing well on a long-term solution. . . **kudos to everyone who is out there working hard, trying to come up with a long-term solution here** . . . ") (emphasis added).   The Foundation, for its part, expressed its view that a long-term solution was within reach.  *Id.* at 16 (attached hereto as Ex. I at 563) ("[W]e would have not been part of a short-term solution if there were no prospect of a long-term solution.").

**E.  Continued Optimism and Additional Funding**

20.     Over the ensuing weeks, the Defendant Debtors continued to diligently pursue funding that would allow the Pennsylvania Hospitals to remain open.  On March 19, 2025, the Court held a hearing in which the Defendant Debtors reported as follows:

> I stand before you this morning **more optimistic than I have been** the last couple times that I've been here. . . Critical parties . . . have been working literally 24 hours a day on this. You know, just hundreds and hundreds of calls and meetings. . . And we think we are pointed towards a good solution. Again, we're not there yet. We have a hearing before Your Honor on the 26th, next Tuesday. . . But we are, I'm very happy to say, **in the early stages**

**of an APA**. And I think that our intent would be to **use that hearing on the 26th hoping beyond hope for a hearing on a sale, on a transition**.

March 19, 2025 Hearing Tr., Dkt. 1303 at 69 (emphasis added) (attached hereto as Ex. D at 301).

21.    The Pennsylvania AG's office verified that the Defendant Debtors had accurately reported the current state of affairs.  *Id*. at 71 (attached hereto as Ex. D at 303) ("I just want to indicate that [the Debtors'] summary is accurate.  We have been working with many parties to find a resolution. . . **We are cautiously optimistic that we will have a long-term plan** . . . hopefully we will have a final APA or at least close to a final APA to present to you next week.") (emphasis added).

22.    On March 24, 2025, the Court held another hearing, at which the Defendant Debtors reported that they had obtained further funding that would again at least postpone closure.  Specifically, the Defendant Debtors reported that "**the Foundation has agreed to fund an incremental $13 million**."  March 24, 2025 Hearing Tr., Dkt. 1350 at 5 (attached hereto as Ex. E at 351) (emphasis added).  The Defendant Debtors further reported that, "with regard to the big picture and the long-term solution, we've also made good progress over the last few days" and that it was "back on track" and "**progressing towards a transaction and an APA**," which would be "a transaction with essentially a partnership between Delaware County and Penn, with support from the Commonwealth and from other parties."  *Id*. at 6-7 (attached hereto as Ex. E at 352-353) (emphasis added).  The Court was cautiously optimistic:  "Not to get ahead of myself, but **it sounds like we're on the verge of breathing a sigh of relief that there's a long-term solution here** . . . it sounds like we're on a roll here."  *Id*. at 9 (attached hereto as Ex. E at 355) (emphasis added).

23.    Again the Defendant Debtors' factual recitation was supported by other parties in interest, including (i) the Pennsylvania AG's office, who referred to it as an "accurate summary" and reported that the parties "have now been **working around the clock to try to find a resolution**

to this matter" and (ii) Delaware County, who "echo[ed] everything that the Attorney General and the Debtors have said" and stated that it was "**very important that [the Pennsylvania Hospitals] stay open** to us and available to the citizens of the county." *Id.* at 15 (attached hereto as Ex. E at 361) (emphasis added).

### F. The Defendant Debtors Continue To Seek A Long-Term Solution

24.    The Defendant Debtors and other stakeholders subsequently continued in their efforts to secure a long-term solution for the Pennsylvania Hospitals.  On March 25, 2025, the Pennsylvania AG issued a statement that he was "encouraged that the parties, today, remained focused on preserving accessible healthcare for the Delaware County community and maintaining the workforce that provides that essential care." *See* Ron Southwick, *Officials Tout Progress in Preserving Two Pennsylvania Hospitals*, CHIEF HEALTHCARE EXEC. (Mar. 25, 2025), https://www.chiefhealthcareexecutive.com/view/officials-tout-progress-in-preserving-two-pennsylvania-hospitals (attached hereto as Ex. A-2 at 13).

25.    During an April 1, 2025 hearing, the Defendant Debtors reported **"[t]he parties have continued both conversations and extensive meetings since we were last before you"** and that, "[w]hile no resolution has been reached, **we continue to work around the clock to get to a solution**." April 1, 2025 Tr., Dkt. 1435 at 3 (attached hereto as Ex. J at 571) (emphasis added).

26.    The Court held another hearing on April 8, 2025, however, at which the Defendant Debtors warned that the Pennsylvania Hospitals were "running out of time and money" although "no decision has been made on closure." April 8, 2025 Hearing Tr., Dkt. 1547 at 4-5 (attached hereto as Ex. F at 370-71).  The Defendant Debtors reported that "**[t]he parties are in the process of attempting to secure additional funding that will allow us an additional two weeks to continue negotiations and reach a resolution** . . ." *Id.* at 5 (attached hereto as Ex. F at 371) (emphasis added).

27.     The Defendant Debtors were cognizant, however, of being able to "shut down safely" if that became necessary and therefore the need to "strike a balance between . . . being optimistic that we can reach a deal and . . . not running out of cash." *Id*. at 6 (attached hereto as Ex. F at 372) ("[W]e have to walk a tightrope with regard to when to commence closure.").

28.     The Attorney General's office also provided a report that the parties "have been working around the clock to find a resolution" and that "**we are still in that first stage of this case" where the "number one [goal] was to try to save these entities**." *Id*. at 12 (attached hereto as Ex. F at 378).

29.     The Court, for its part, expressed that it "just want[s] this to get done" and expressed that it had "**thought we were on a transaction path, a sale path** . . ." *Id*. at 21, 36 (attached hereto as Ex. F at 387, 402).  The Court expressed concern that "we're kind of at the end of the road," but still encouraged "somebody to be a hero here" and noted that "**maybe we're going to get two more weeks of funding**." *Id*. at 43 (attached hereto as Ex. F at 409) (emphasis added).

30.     The Court held another hearing two days later, on April 10, 2025, at which the parties discussed the outlines of a funding proposal from Penn Medicine.  The Court explained that it was "**happy, cautiously optimistic**" upon hearing that "Prospect is not going forward with the closure motion."  April 10, 2025 Hearing Tr., Dkt. 1548 at 3 (attached hereto as Ex. G at 421) (emphasis added).

31.     The Defendant Debtors explained that, with "the assistance of the Pennsylvania AG . . . **Penn came forward with a proposal that's still being worked out as far as the details but . . . will result in a total of $5 million coming into this process in the near term** . . . Delaware County on that same call stepped up and . . . got us an additional $1 million . . . ." *Id.* at 5 (attached hereto as Ex. G at 423) (emphasis added).

32.     This additional funding was important not just for the wellbeing of patients who relied on the Pennsylvania Hospitals, but also for the hospitals' employees, who were anticipated to remain in their jobs through any transition.  The Pennsylvania AG's office explained the parties' views in this regard:

> As [the Debtors] noted, I think **it's also important to highlight the employees are not being forgotten**. And throughout this process, we've used the term that employees' services may be transitioned. And **what's going to happen is that employees may be wearing different jerseys, but they'll continue doing their job**s. And I think it's important for employees and patients in the community to hear that and know that they will continue to be supported.

*Id*. at 20-21 (attached hereto as Ex. G at 438-39) (emphasis added).

33.     News agencies publicly reported the additional funding, which at a minimum postponed closure of the Pennsylvania Hospitals.  *See* Kenny Cooper, *Penn Medicine and Delaware County Dish Out $6M to Delay Crozer Health Closure*, WHYY (Apr. 10, 2025), https://whyy.org/articles/crozer-health-system-closure-penn-medicine-delaware-county/. ("Prospect . . . retreated Thursday from shutting down Crozer Health, granting an unnamed consortium of buyers about a week to strike a deal . . . News of the last-ditch funding 'relieved' [the Bankruptcy Court] . . . the union said its primary concern is the 'stability of the health care system in Delaware County' and that '**Keeping frontline staff in the buildings and on the job is integral to that concern** . . .'") (attached hereto as Ex. A-3 at 14-19) (emphasis added).

### G.  The WARN Notices and Supplemental Closure Motion

34.     Notwithstanding these efforts, and contrary to the Defendant Debtors' reasonable expectations throughout the prior months, the Defendant Debtors and the Pennsylvania AG were unfortunately ultimately unable to find an acquirer for the Pennsylvania Hospitals, even free and clear of debt.  Accordingly, on April 21, 2025, the Debtors filed the *Supplement to the Debtors' Emergency Motion for Entry of an Order (I) Approving the Closure of the Pennsylvania Hospitals;*

11

*and (II) Granting Related Relief* [Docket No. 1574] (the "<u>Supplemental Closure Motion</u>")

(attached hereto as Ex. L at 642-61), seeking to approve (i) the Defendant Debtors' updated

Closure Plan with the cessation of certain services beginning on April 22, 2025, and (ii) procedures

to sell available assets of the Pennsylvania Hospitals.

35.     That same day, the Defendant Debtors issued WARN notices to employees of the

Pennsylvania Hospitals.  *See* Compl. at ¶¶ 8, 26-27.

36.     At a hearing the following day, April 22, 2025, the Defendant Debtors explained to

the Court why closure, and the related WARN notices, had become necessary:

> Unfortunately, shortly after that week [of April 10], things took a few turns
> for the worse. After a few-day delay, **we received a term sheet from Penn
> for the transaction that was broader than we originally understood**, and
> also, importantly, would burden the estate with substantial additional
> administrative expenses. . . . The donation portion of the $5 million was --
> when we received the term sheet, it was -- the donation was contingent upon
> the closing of the transaction, which would not get us the money anywhere
> near where we needed it in terms of timing.  But perhaps most importantly,
> Your Honor, **. . .within a day or two of receiving the term sheet from
> Penn, we received word from the Pennsylvania AG that there was not
> going to be an APA** and there was no long-term solution here that was
> going to be reached.

April 22, 2025 Hearing Tr., Dkt. 1627 at 11 (attached hereto as Ex. H at 455) (emphasis added).

37.     On April 23, 2025 the Bankruptcy Court entered an order approving the

Closure/Sale Motion [Docket No. 1613] (the "<u>Closure Order</u>") (attached hereto as Ex. P at 833-

48), and the Debtors commenced the closure of the Pennsylvania Hospitals.

**H.   The Instant Lawsuit**

38.     On May 5, 2025, Plaintiff Amanda Cannavo filed the *Class Action Adversary*

*Proceeding Complaint for Violation of Warn Act 29 U.S.C. § 2101, et seq.* (the "<u>Complaint</u>"),

alleging that the Defendants failed to provide 60 days advance written notice of their terminations,

as required by the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq,

(the "WARN Act").

39.    The Complaint requests, among other things, judgment on behalf of a putative class

of employees of the Pennsylvania Hospitals equal to the sum of their unpaid wages, salary,

commissions, bonuses, accrued holiday and vacation pay, health and life insurance, and other

ERISA benefits, for 60 days, and treatment of all damages as first priority administrative expenses

pursuant to 11 U.S.C. § 503(b)(1)(A).

## ARGUMENT

## I.    Legal Standard

40.    "To defeat a motion to dismiss filed pursuant to Federal Rule of Civil Procedure

12(b)(6), a plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"

*Crutchfield v. Match Grp., Inc.*, 529 F. Supp. 3d 570, 587 (N.D. Tex. 2021) (quoting *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To meet this standard, a plaintiff must establish

"more than a sheer possibility that a defendant has acted unlawfully." *Id.*  The court must accept

well-pleaded facts as true and view them in the light most favorable to the plaintiff, however, the

court does not accept as true "conclusory allegations, unwarranted factual inferences, or legal

conclusions." *Id.* (citing *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007)).  A plaintiff

must provide "more than labels and conclusions, and a formulaic recitation of the elements of a

cause of action will not do." *Id.* (quoting *Twombly*, 550 U.S. at 555).[2]

41.    In ruling on a Rule 12(b)(6) motion the court may consider documents outside of

the pleadings if they fall within certain limited categories.  *Id.*  First, a "court is permitted . . . to

rely on 'documents incorporated into the complaint by reference, and matters of which a court may

---

[2]    The Defendant Debtors dispute the facts as detailed in the Complaint and reserve all rights to dispute such facts
in any responsive or subsequent pleading.

take judicial notice.'" *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (citation

omitted).  Second, a "court may consider documents attached to a motion to dismiss that 'are

referred to in the plaintiff's complaint and are central to the plaintiff's claim.'" *Sullivan v. Leor*

*Energy, LLC*, 600 F.3d 542, 546 (5th Cir. 2010) (citation omitted).  Third, "[i]n deciding a 12(b)(6)

motion to dismiss, a court may permissibly refer to matters of public record." *Cinel v. Connick*, 15

F.3d 1338, 1343 n.6 (5th Cir. 1994) (citations omitted); *see also, e.g.*, *Funk v. Stryker Corp.*, 631

F.3d 777, 783 (5th Cir. 2011) (stating, in upholding district court's dismissal pursuant to Rule

12(b)(6), that "the district court took appropriate judicial notice of publicly-available documents

and transcripts produced by the [Food and Drug Administration], which were matters of public

record directly relevant to the issue at hand") (internal citations omitted).

42.     The Fifth Circuit provided a summary overview of the WARN Act in *Flexible Flyer*

as follows:

> The WARN Act, 29 U.S.C. §§ 2101–2109, requires covered employers who are
> planning a plant closing or mass layoff to give affected employees sixty days notice
> of such action. 20 C.F.R. § 639.2. Advance notice is meant to provide "workers and
> their families some transition time to adjust to the prospective loss of employment,
> to seek and obtain alternative jobs and, if necessary, to enter skill training or
> retraining." *Id.* § 639.1. There are exceptions, however, that excuse employers who
> fail to provide the required notice. *See id.* § 639.9. If a WARN Act exception
> applies, employers are required to give only "as much notice as is practicable." *Id.*

*In re Flexible Flyer Liquidating Tr.*, 511 F. App'x 369, 372 (5th Cir. 2013).

## II.     The Unforeseeable Business Circumstances Exception to WARN Mandates Dismissal

43.     The Defendant Debtors do not dispute that they issued WARN notices  to certain

employees of the Pennsylvania Hospitals less than 60 days before their employment was

terminated.   There are three statutory exceptions to the 60-day WARN notice requirement,

however, that allow for less than 60 day notice and only mandates "as much notice as is

practicable."   20 CFR § 639.9. Relevant here, "the 'unforeseeable business circumstances'

exception under section 3(b)(2)(A) of WARN applies to plant closings and mass layoffs caused by business circumstances that were not reasonably foreseeable at the time that 60-day notice would have been required."  20 CFR § 639.9(b).

44.     The Fifth Circuit has opined and further elucidated on the unforeseen business circumstances exception with respect to federal WARN Act claims.  *See In re Flexible Flyer Liquidating Tr.*, 511 F. App'x 369 (5th Cir. 2013) (affirming application of unforeseen business circumstance exception).  "Closings and layoffs are not foreseeable when 'caused by some sudden, dramatic, and unexpected action or condition outside the employer's control.'"  *Id.* (citing 20 CFR. § 639.9(b)(1)).  "In assessing the foreseeability of business circumstances, our focus is 'on an employer's business judgment.' An employer is required only to 'exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market.'"  *Id.* (citations omitted).  Moreover, "where it only is ***possible*** that the business circumstance at issue may occur, such circumstances are ***not*** reasonably foreseeable . . . Rather, 'it is the probability of occurrence that makes a business circumstance 'reasonably foreseeable' and thereby forecloses use of the [unforeseeable business circumstances] exception."  *Id.* at 373 (citing and quoting *Halkias v. Gen. Dynamics Corp.*, 137 F.3d 333, 336 (5th Cir. 1998)) (emphasis added).  Probable is defined as "when the objective facts reflect that the layoff was more likely than not."  *Varela v. AE Liquidation, Inc. (In re AE Liquidation, Inc.)*, 866 F.3d 515, 530 (3d Cir. 2017).  The import of the probability standard set forth in *Halkias* and *Flexible Flyer* is to "strike an appropriate balance in ensuring employees receive the protections the WARN Act was intended to provide without imposing an 'impracticable' burden on employers that could put both them and their employees in harm's way."  *Id.* (citing *Halkias v. Gen. Dynamics Corp.*, 137 F.3d 333, 336 (5th Cir. 1998)).

45.     The Defendant Debtors easily and publicly satisfy the elements of the unforeseeable business circumstances exception and therefore Plaintiff cannot state a claim for violation of the WARN Act.  The Defendant Debtors issued WARN notices on April 21, 2025, providing 14-day notice of termination, (Compl. at ¶¶ 8, 26-27), which was as soon as practicable.

46.     As the Court and Plaintiffs are aware, the Defendant Debtors operate general acute care hospitals in Pennsylvania (Compl. at ¶¶ 13.)  The unforeseen business circumstance here – the lack of funding to maintain operations through a transition of the hospitals – did not become probable until shortly before the date that the notices were issued and the Supplemental Closure Motion was filed.  In order to ensure an adequate workforce to protect patient health and safety, the Defendant Debtors did not issue WARN notices until they exhausted all efforts to keep the hospitals and related operations open, through necessary funding and an ultimate transition of operations.

47.     It is true that as of March 6, 2025, the Pennsylvania Hospitals – like the debtor in *Flexible Flyer* – were losing money.  *See Flexible Flyer*, 511 F. App'x at 370 ("Flexible Flyer never made a profit—indeed it constantly lost money—but hope and a few good signs kept it going.").  It is also true that the Defendant Debtors filed their initial Closure Motion on that date.  But that does not mean that closure was the "probable" – as opposed to a possible – outcome at that time.  As was made abundantly clear to the Court and all interested parties, the Closure Motion was a procedural necessity to ensure a safe transition of patient services in the event that closure were to become necessary.  As the Defendant Debtors explained at the March 6, 2025 hearing, "we are always working and hoping for the best, but wouldn't be doing our jobs if we weren't preparing for the worst."  March 6, 2025 Hearing Tr., Dkt. 916 at 18 (attached hereto as Ex. C at 195).  The Court itself noted "the regulatory requirement that hospitals like these . . . have a closure

16

plan already" and it described the Debtors' motion as a "backup motion for closure." *Id*. at 37 (attached hereto as Ex. C at 214).

48.     As discussed in detail above, judicially noticeable facts make clear that through and until mid-April, the Debtors were actively and urgently engaged in efforts to identify short- and long-term funding solutions that would have allowed the Pennsylvania Hospitals to remain operational. *See supra* at ¶¶ 14-16.  In fact, the Court ordered the Defendant Debtors and other parties to meet multiple times to discuss transition options. *See id*.  Presumably, the Court would not have done so if there were no reasonable prospect of an outcome that would have avoided closure.

49.     As the Court is well aware, the Defendant Debtors and numerous other interested parties worked tirelessly to negotiate what they reasonably believed was an achievable solution for the Pennsylvania Hospitals until shortly before the WARN notices were issued.  *See*, *e.g.*, March 6, 2025 Tr., Dkt. 916 at 3-4 (attached hereto as Ex. C at 180-81); April 22, 2025 Tr., Dkt. 1627 at 11 (attached hereto as Ex. H at 455).  Those efforts bore fruit on multiple occasions.  The Defendant Debtors *did* obtain financing for the Pennsylvania Hospitals as a direct result of the meeting that the Court ordered during the March 6, 2025 hearing.  *See* Supplemental Rundell Declaration, ¶ 14 (attached hereto as Ex. L at 648-49).  On March 24, 2025, the Defendant Debtors obtained an additional $13 million from the Foundation that allowed the Defendant Debtors to remain operational for an additional two weeks. *See id.* at ¶ 18 (attached hereto as Ex. L at 650).

50.     The record also reflects that there was also a realistic opportunity for additional funding, even though such funding did not ultimately materialize, to bridge to a transaction.  As the Foundation's counsel informed the Court, "we would have not been part of a short-term solution if there were no prospect of a long-term solution."   March 11, 2025 Hearing Tr., Dkt.

1162 at 16 (attached hereto as Ex. I at 563).   On March 19, 2025, the Attorney General's office

was likewise "cautiously optimistic that we will have a long-term plan."  March 19, 2025 Hearing

Tr., Dkt. 1303 at 71 (attached hereto as Ex. D at 303).  Indeed, as late as April 10, 2025, the parties

and the Court were cautiously optimistic that additional funding would be available to bridge to a

transaction with Penn.  April 10, 2025 Hearing Tr., Dkt. 1548 at 3, 5 (attached hereto as Ex. G

421, 423).  It did not become "probable" until a week later – on Thursday, April 17, 2025 - that

the funding and Penn transaction would not materialize.  WARN notices were sent to employees

two business days later, on Monday, April 21, 2025.

51.     The Defendant Debtors acted as any reasonable company in their shoes and in the

healthcare industry would have acted in trying to save their company and the critical jobs and

services it provided, while at all times protecting patient safety.  Likewise, the Defendant Debtors

acted reasonably in issuing WARN notices only once it had become probable that no solution

would be achievable.  *See supra* at ¶¶ 35-37.  Indeed, providing the full 60-day notice would have

the "perverse effect[] of . . . prompting employees to unnecessarily leave their jobs" which is a

unacceptable option in healthcare.  *Varela v. AE Liquidation, Inc. (In re AE Liquidation, Inc.)*, 866

F.3d 515, 530 (3d Cir. 2017).  The fact that the Defendant Debtors' tireless efforts ultimately were

unsuccessful is a tragedy but also is precisely the reason that the unforeseeable business

circumstance exception precludes WARN Act liability.  *Flexible Flyer*, 511 F. App'x at 373 ("The

record showed that sixty days before the shutdown, Flexible Flyer was undisputedly experiencing

financial difficulties.  But, even so, there was no indication that a company shutdown was

imminent . . . until almost the last moment, [the debtor's CFO] had been working tirelessly to turn

the company around and was considering a number of cost-saving measures designed to keep the

company operating for as long as possible.").

## **CONCLUSION**

52.     WHEREFORE, the Defendant Debtors request entry of an order substantially in the form attached hereto granting the relief requested herein and granting such other relief as is just and proper.

Dated:  June 20, 2025
Dallas, Texas

/s/ Rakhee V. Patel
_____

**SIDLEY AUSTIN LLP**
Thomas R. Califano (24122825)
Rakhee V. Patel (00797213)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:     (214) 981-3300
Facsimile:      (214) 981-3400
Email:           tom.califano@sidley.com
                      rpatel@sidley.com

*and*

William E. Curtin (admitted *pro hac vice*)
Jon W. Muenz (admitted *pro hac vice*)
Patrick Venter (admitted *pro hac vice*)
Anne G. Wallice (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:     (212) 839-5300
Facsimile:      (212) 839-5599
Email:           wcurtin@sidley.com
                      jmuenz@sidley.com
                      pventer@sidley.com
                      anne.wallice@sidley.com

*Attorneys for the Defendant Debtors*

### Certificate of Service

I certify that on June 20, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

*/s/ Rakhee V. Patel*
Rakhee V. Patel